John W. LOWE, Plaintiff,

v.

The CALIFORNIA COMPANY and/or Chevron Oil Company and Labor Services, Inc., and Travelers Insurance Company, Defendants.

John W. LOWE, Plaintiff,

v.

PLAQUEMINES EQUIPMENT & MACHINE CO., Inc., and Aetna Casualty & Surety Company, and Chevron Oil Company, the California Company Division, Defendants.

Civ. A. Nos. 67–1804, 68–170.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 6, 1969.

J. Stanley Wagner, Robert G. Hebert, New Orleans, La., for plaintiff.

George V. Baus, Patrick Schott, Robert Vosbein, Frank C. Allen, Jr., T. C. W. Ellis, New Orleans, La., for defendants.

CASSIBRY, District Judge:

An offshore oil field worker seeks to recover for injuries suffered on a vessel that served as a tender for the stationary drilling platform where he principally performed his work as a welder's

helper. The litigation concerns two suits which were consolidated for trial. In one, the worker, John W. Lowe, an employee of Plaquemines Equipment & Machine Co., Inc. (hereinafter referred to as Pemco), alleges a maritime tort claim against Chevron Oil Company, The California Company Division (hereinafter referred to as Chevron), the owner of the vessel on which he was injured, and Labor Services, Inc., a roustabout company working on the vessel for Chevron. Chevron and Labor Services filed a third-party complaint against Pemco, and Aetna Casualty & Surety Company intervened seeking reimbursement for workmen's compensation benefits already paid to Lowe. In the other suit, Lowe, claiming to be a seaman, asserts a Jones Act claim against his employer, Pemco, and an unseaworthiness claim against the vessel owner, Chevron. Pemco filed a third-party complaint against Labor Services and a cross-complaint against Chevron. The cases were settled with the plaintiff for $140,000, Pemco and Labor Services each agreeing to advance one-half of the settlement, with the issue of the apportionment of liability among Pemco, Labor Services and Chevron to be tried to the Court as if Lowe had continued this litigation. Determining the defendants' respective liability is complicated by the insulation from suit provided Pemco by the Longshoremen's and Harbor Workers' Act, 33 U.S.C. § 905, and the indemnity provided Chevron by both Pemco and Labor Services in their contracts. But before discussing these protective elements, it is first necessary to set forth the findings of fact—the framework for extricating liability out of this maze of immunities and indemnities.

### FINDINGS OF FACT

The injury to plaintiff occurred aboard the Chevron LST S–22 on February 14, 1966, at about 7:30 P.M. in Block 41 Gulf of Mexico off of Plaquemines Parish, Louisiana. The S–22, which provided supplies and living quarters for workers on the stationary oil and gas drilling platform, was moored bow to the rig. Labor Services, working under contract for Chevron, was engaged in transferring certain equipment from the S–22 to the rig through the operation of two winch machines, with controls at the midship and bow. Howard Walden, roustabout pusher for Labor Services, was operating the bow winch, whose controls are situated on the starboard side of the "tubing rack," a platform built at the bow end of the S–22. The winch runners are arranged to transport the cargo over this tubing rack, as one of the tubing rack's purposes is to steady the cargo by setting it down in the tubing rack before the run is made up to the rig.

A welding machine owned by Pemco (also working under contract for Chevron) was placed, at the direction of Pemco, on the starboard side of the tubing rack, and was being used exclusively by the Pemco crew to conduct certain welding operations on the rig structure. On the date of the accident, February 14, 1966, Pemco's pusher, "Pete" Armand, had instructed Lowe to roll up the welding leads and turn off the machine preparatory to Pemco's quitting work for the evening. Lowe crossed from the rig to the ship and went onto the tubing rack. Walden, who had moved a load to the rig which was being discharged, saw Lowe at the head of the steps of the tubing rack and, according to his testimony, assumed that the welding personnel were completing operations for the day and that Lowe was on the tubing rack to shut down the machine. Walden's attention was then re-directed to his winch operations. Some three to four minutes later, the load had been discharged; Walden again looked and Lowe was no longer visibly present, although the welding machine was still running. The block on the runners was then brought back down to the tubing rack level in ordinary course. While the runners usually can be kept taut when the load is being carried, upon the return there is necessarily a sag in the line caused by the weight of the runners

themselves when empty. As the slack in the line was being drawn in by the midship winches, apparently the winch block caught under the skids of the welding machine and flipped it over onto Lowe, who was squatted down near the tubing rack floor level still attempting to shut off the machine.

■ In view of these facts and others to be delineated below, I find that both Pemco and Labor Services were proximately negligent in causing plaintiff's injuries. Pemco not only was negligent in having had the welding machine placed in the path of the moving winch machinery, thereby creating an extremely hazardous condition, but also in having ordered Lowe—an inexperienced hand who had been in Pemco's employ for only three weeks, who had been awake for at least 20 hours, who had worked three overtime hours in addition to the regular twelve-hour shift, who had never worked offshore before, who had never turned the welding machine off before, who did not know to signal to stop the winches nor, for that matter, that the tubing rack was in the path of the winch runners, and who had not received any safety courses or instructions except that Pemco required its employees to wear hard hats and safety shoes—to shut down the machine without having signalled Walden or notified the pusher for Labor Services to stop the winches. Unquestionably Pemco breached its obligation to instruct this "untutored, inexperienced, green-hand" about the proper performance of his duties and to warn him of the hazards involved. Davis v. Parkhill-Goodloe Company, 302 F.2d 489, 491 (5th Cir. 1962). See also Justillian v. Versaggi, 169 F. Supp. 71 (S.D.Tex.1954).

■ Labor Services' negligence is predicated upon the failure of its winch operator, Walden, to exercise proper care and caution in transporting equipment to and from the platform. Regardless of the presence of the welding machine, work on the tubing rack was dangerous, as any worker exposed himself to the danger of the moving runners. Placing the welding machine there increased this danger considerably; yet Labor Services took no additional safety precautions. Moreover, Walden saw the plaintiff come onto the tubing rack, assumed he was there to shut down the welding machine, and, because plaintiff was no longer visible, started down with the cables and block *even though the machine was still running.* Had Walden checked to see whether Lowe had left the tubing rack, as was clearly his duty under the circumstances, this accident would never have happened. Labor Services, therefore, was also negligent.

■ With regard to Chevron, the owner of the vessel, I find no negligence. Chevron took no part in the decisions to place the welding machine on the tubing rack and to continue the winch operations, which are solely attributable to Pemco and Labor Services. Nor is there any indication that Chevron failed to fulfill its obligation to provide the plaintiff a safe place in which to work.

### JONES ACT CLAIM AGAINST PEMCO

■ Lowe's employer, Pemco, having been found negligent, is potentially liable for Lowe's injuries under the Jones Act, 46 U.S.C. § 688, provided, of course, he is a "seaman" within the meaning of the Act. If on the other hand, Lowe is not such a seaman, the recovery against his employer is limited to the $13,471.96 in workmen's compensation benefits and medical expenses he has already been paid under the Longshoremen's and Harbor Workers' Compensation Act, 33 U. S.C. §§ 901–950. See Pure Oil Company v. Snipes, 293 F.2d 60, 68 (5th Cir. 1961). The Court must therefore determine whether Lowe, though primarily employed as a welder's helper on a stationary drilling platform, which is not a "vessel" entitling him to seaman status,

Dronet v. Reading & Bates Offshore Drilling Company, 367 F.2d 150 (5th Cir. 1966), was sufficiently associated with the tender, a special purpose craft which is a vessel, Offshore Company v. Robison, 266 F.2d 769, 771, 75 A.L.R.2d 1296 (5th Cir. 1959), to claim seaman status. To find Lowe a seaman under the Jones Act, the Court must find that he was:

(1) more or less permanently connected with a vessel, and

(2) performing duties which contributed to the overall function or purpose of the vessel.

Offshore Company v. Robison, *supra* at 779; Ross v. Delta Drilling Company, 213 F.Supp. 270 (E.D.La.1962).

■ In connection with his work on the platform, Lowe had occasion to board the S–22 to perform incidental duties such as refueling the welding machine and carrying tools and supplies between the tender and the platform. Lowe also used the S–22 for his living quarters and meals. And, of course, he was injured while working on the tender. But none of these connections with the tender overcomes the fact that Lowe's place of primary employment was the fixed platform; he was not assigned permanently to a vessel; nor did he perform a substantial part of his work on the vessel. While he necessarily performed duties contributing to the function of the vessel, this was not to such an extent as to require that he be found a Jones Act seaman. Offshore Company v. Robison, *supra;* Johnson v. Noble Drilling Company, 264 F.Supp. 104 (W.D.La.1966); Ross v. Delta Drilling Company, *supra.* Cf. Freeman v. Aetna Casualty & Surety Company, 398 F.2d 808 (5th Cir. 1968); Creel v. Drill Tender Jack Cleverly, 264 F.Supp. 98 (W.D.La.1966). See generally Comment, 27 La.L.Rev. 757 (1967). Thus Lowe is not a seaman for the purposes of the Jones Act and is limited in his recovery against Pemco to the workmen's compensation benefits already received.

## CLAIMS AGAINST LABOR SERVICES AND CHEVRON

■■ Lowe also asserts a maritime tort claim against Labor Services and Chevron, but as Chevron was not negligent, plaintiff's tort claim is valid only against Labor Services, which was negligent. The full burden of this liability necessarily falls on Labor Services. It cannot seek contribution from joint tort-feasor Pemco pursuant to its third-party complaint, because contribution between joint tort-feasors is not permitted in admiralty non-collision cases. Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 98 L.Ed. 318 (1952); Hartford Accident & Indemnity Co. v. Gulf Refining Co., 230 F.2d 346 (5th Cir. 1956); cert. denied, Gulf Refining Co. v. Black Warrior Towing Co., 352 U.S. 832, 77 S.Ct. 49, 1 L.Ed.2d 52 (1957). Nor is there any basis for Labor Services to assert an implied contract of indemnity under the theory established in Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Cf. Loffland Brothers Company v. Roberts, 386 F.2d 540 (5th Cir. 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968). However, Labor Services' burden is halved (putting aside for the moment the indemnity agreements of Pemco and Labor Services with Chevron) by Lowe's valid unseaworthiness claim against Chevron. With respect to this claim, there was general agreement that Chevron owed Lowe the traditional warranty of a seaworthy vessel, that this warranty was breached by the hazardous placement of the welding machine and the careless operation of the bow winch, and that Chevron was liable for any injuries Lowe suffered as a result of this unseaworthy condition. Chevron is therefore jointly and severally liable with Labor Services for Lowe's injuries, and is responsible for payment of one-half of the $140,000 settlement. Yet Chevron, because of certain indemnity agreements which it holds, seeks to transfer this liability to either Pemco or Labor Services, or both.

## THE INDEMNITY AGREEMENTS

 In its contract with Chevron, Pemco agreed:

to defend and hold [Chevron] indemnified and harmless from and against any loss, expense, claim or demand for:

(a) Injury to or death of [Pemco's] employees * * * in any way arising out of or connected with the performance by [Pemco] of services hereunder; * * *

In language just as clear and unequivocal, Labor Services agreed to indemnify Chevron against any claim for:

injury to * * * third parties * * in any way arising out of or connected with the performance by [Labor Services] of services hereunder, unless caused solely by the negligence of [Chevron]; provided that if such injury * * * is caused by the joint or concurrent negligence of [Labor Services] and [Chevron] each shall be liable for one-half of the loss, expense, claim or demand resulting therefrom.

As both Pemco and Labor Services were found negligent, while Chevron was found free from any negligence, clearly Pemco and Labor Services are liable under their indemnity agreements for Chevron's $70,000 contribution, and each should provide one-half of the amount.

Pemco contends, however, that in view of certain exchanges between the counsel for Chevron and Labor Services, by which Labor Services assumed its obligations under its indemnity agreement, Pemco is relieved of any responsibility it may have had to indemnify Chevron, thus leaving Labor Services as the sole indemnitor. This argument is premised upon Chevron's failure, until after Labor Services already had agreed to defend and indemnify Chevron, to invoke Pemco's indemnity agreement by way of an amended third-party complaint. It is submitted, therefore, that since Chevron could suffer no loss, having already been indemnified by Labor Services, it was no longer the real party in interest and could not amend its third-party complaint against Pemco to include the written indemnity agreement. It is further contended that if Labor Services is found to have filed the amended complaint on behalf of Chevron, it is without merit for Labor Services has offered no evidence that it was assigned, or subrogated to, any rights of Chevron. Pemco cites no authority for these propositions; nor do I find any.

In propounding this argument, Pemco has apparently confused the two roles played by Labor Services in this litigation. On the one hand, Labor Services is a defendant in an action for maritime tort; on the other hand, Labor Services, by assuming its obligations under its contract, is acting as counsel and indemnitor for Chevron, which is a defendant in the unseaworthiness cause of action. Chevron, then, is at all times a real party in interest who has not assigned, subrogated, or terminated any of its rights against Pemco under Pemco's indemnity agreement, and who is entitled—either through its own counsel or that of Labor Services on its behalf—to assert this contract in the third-party complaint against Pemco.

## CONCLUSION

I have found both Labor Services and Chevron jointly and severally liable to Lowe. Each must therefore respond with one-half of the settlement, or $70,000. But Chevron has been indemnified against loss by both Labor Services and Pemco, who must each contribute one-half of Chevron's liability, or $35,000. In sum, Pemco owes Lowe $35,000, while Labor Services owes him $105,000. Since Pemco and Labor Services each contributed $70,000 to the settlement, Pemco is entitled to collect $35,000 from Labor Services. It is ordered that judgment be entered accordingly. It is further ordered that judgment be entered against plaintiff on behalf of intervenor, Aetna Casualty and Surety Company, for all amounts paid under the Longshoremen's and Harbor Workers' Compensation Act.